THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT B. CHIPMAN<br>3619 Upton St. NW<br>Washington, DC 20008<br><br>　　　　　　Plaintiff,<br><br>　　　　v.<br><br>CIGNA BEHAVIORAL HEALTH, INC.,<br>PO Box 188064<br>Chattanooga, TN 37422<br><br>　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No:<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

1. Plaintiff, Robert B. Chipman ("Plaintiff"), by and through his undersigned counsel, initiates this action against Defendant Cigna Behavioral Health, Inc. ("Cigna") for unlawful denial of medical benefits for Plaintiff's dependent child ("beneficiary") in violation of the Employee Retirement Income Security Act of 1974 ("ERISA").

**JURISDICTION AND VENUE**

2. This Court has jurisdiction based upon 29 U.S.C. §§ 1132(e)(1) and (f). Those provisions give the district court jurisdiction to hear civil actions brought to recover benefits due under the terms of an employee welfare benefit plan, which, in this case, involves a group health plan insured and administered by Cigna for the benefit of Merkle, Inc. ("Merkle") employees and their dependents.

3. This action may also be brought before the district court pursuant to 28 U.S.C. § 1331, which provides subject matter jurisdiction over actions that arise under the laws of the United States.

4. This action arises under ERISA, *as amended*, 29 U.S.C. § 1132(a)(1)(B) and § 1132(a)(3)(B). This Court has jurisdiction under 29 U.S.C. § 1132(e)(1).

5. Venue is proper pursuant to the provisions of 29 U.S.C. § 1132(e)(2) because it is where the breach took place, as Plaintiff resides in the District of Columbia and it is where his benefits would have been paid.

## NATURE OF ACTION

6. This case seeks payment of health benefits due under a group health insurance plan, group number 3339205. The plan name is the Merkle Open Access Plus Medical Benefits Plan ("Plan"). The Plan is sponsored by Merkle, and insured and administered by Cigna, to provide health benefits to Merkle employees. This action is brought as a claim for benefits under 29 U.S.C. § 1132(a)(1)(B). Plaintiff also seeks attorneys' fees under 29 U.S.C. § 1132(g).

## PARTIES

7. At all times relevant hereto, Plaintiff is and was a resident of the District of Columbia; and the events relevant to the denial of his claim for health benefits on behalf of Plaintiff's beneficiary took place within the District of Columbia.

8. At all times relevant hereto, Cigna was the insurer and administrator of the Plan, was a corporation with its principal place of business in the State of Tennessee, and was doing business within the District of Columbia.

9. At all times relevant hereto, the Plan constituted an "employee welfare benefit plan" as defined under 29 U.S.C. § 1002(1); and incident to Plaintiff's employment with Merkle, Plaintiff's beneficiary received dependent health coverage under the Plan as a "beneficiary" as defined by 29 U.S.C. § 1002(8). This claim relates to health benefits under the Plan.

**RELEVANT PLAN PROVISION**

10. The Plan defines the criteria for coverage of a provided healthcare service in the Cigna Behavioral Health Medical Necessity Criteria ("the Criteria").

11. According to the Criteria, services covered for Residential Mental Health Treatment for Children and Adolescents require the following for admission:

    A. All elements of Medical Necessity must be met

    B. The child/adolescent has been diagnosed with a moderate-to-severe mental health disorder, per the most recent version of the Diagnostic and Statistical Manual of Mental Disorders and evidence of significant distress/impairment.

    C. This impairment in function is seen across multiple settings such as; school, home, work, and in the community and clearly demonstrates the need for 24 hour skilled psychiatric and nursing monitoring and intervention.

    D. As a result of the interventions provided at this level of care, the symptoms and/or behaviors that led to the admission can be reasonably expected to show improvement such that the individual will be capable of returning to the community and to a less restrictive level of care.

    E. The child/adolescent is able to function with age-appropriate independence, participate in structured activities in a group environment, and both the individual and family are willing to commit to active regular treatment participation.

    F. There is evidence that a less restrictive or intensive level of care is not likely to provide safe and effective treatment

12. According to the Criteria, services covered for Residential Mental Health Treatment for Children and Adolescents require the following for continued stay:

A. The individual continues to meet all elements of Medical Necessity.

B. One or more of the following criteria must be met:

i. The treatment provided is leading to measurable clinical improvements in the moderate-to-severe symptoms and/or behaviors that led to this admission and a progression toward discharge from the present level of care, but the individual is not sufficiently stabilized so that he/she can be safely and effectively treated at a less restrictive level of care;

ii. If the treatment plan implemented is not leading to measurable clinical improvements the moderate-to-severe symptoms and/or behaviors that led to this admission and a progression toward discharge from the present level of care, there must be ongoing reassessment and modifications to the treatment plan that address specific barriers to achieving improvement, when clinically indicated; OR

iii. The individual has developed new symptoms and/or behaviors that require this intensity of service for safe and effective treatment.

C. All of the following must be met:

i. The child/adolescent and family are involved to the best of their ability in the treatment and discharge planning process;

ii. Continued stay is not primarily for the purpose of providing a safe and structured environment; AND

iii. Continued stay is not primarily due to a lack of external supports.

13. The Criteria states that, in considering coverage for any level of care, medical necessity must be met as specifically outlined in the individual's benefit plan documents.

14. The Plan states that "Medically Necessary Covered Services and Supplies are those determined by the Medical Director to be:

   A. required to diagnose or treat an illness, injury, disease or its symptoms;

   B. in accordance with generally accepted standards of medical practice;

   C. clinically appropriate in terms of type, frequency, extent, site and duration;

   D. not primarily for the convenience of the patient, Physician or other health care provider; and

   E. rendered in the least intensive setting that is appropriate for the delivery of the services and supplies. Where applicable, the Medical director may compare the cost-effectiveness of alternative services, settings or supplies when determining the least intensive setting.

## FACTS SUPPORTING PLAINTIFF'S CLAIM

### Plaintiff's Medical and Treatment History

15. Plaintiff's beneficiary first began exhibiting mental health and behavioral issues in or around June, 2015. Since then, he has suffered from depression, mood swings, severe and acute anxiety and began inflicting self-harm. He additionally suffered from an eating disorder that limited food consumption to an unhealthy degree. A psychiatrist prescribed ADHD medications and Zoloft, and also recommended that Plaintiff's son receive immediate inpatient treatment.

16. On June 29, 2015, Plaintiff's beneficiary was admitted to inpatient treatment at the children's psychiatric division at Dominion Hospital in Falls Church, VA, for psychiatric therapy and medication for six (6) days.

17. On July 13, 2015, Plaintiff's beneficiary was readmitted to Dominion Hospital after worsening depression and self-harming behavior and statements expressing a desire to commit suicide. The attending psychiatrist at Dominion diagnosed Plaintiff's beneficiary with depression, an unspecified mood regulation disorder and an eating disorder. Plaintiff's beneficiary was discharged on July 17, 2015.

18. From July 31, 2015, through February, 2016, Plaintiff's beneficiary attended a dialectical behavior therapy (DBT) program for young adolescents at the Bethesda Group, and was treated by Dr. Patrick Mitchell. This program consisted of both individual and group therapy at first, and then exclusively individual therapy once-per-week.

19. On April 2, 2016, Plaintiff's beneficiary was hospitalized at Georgetown University Hospital for two days following a suicide attempt. Following this incident, Plaintiff's beneficiary confided to Plaintiff about being sexually assaulted by a peer for over a year. Plaintiff and his wife reported the sexual assaults to the beneficiary's school, and the school reported the incidents to the DC Metropolitan Police.

20. Plaintiff's beneficiary continued to suffer from depression and acute anxiety, and engage in self-harming behavior. On April 28, 2016, Plaintiff's beneficiary was hospitalized at Suburban Hospital-Johns Hopkins Medicine in Bethesda MD following a deliberate overdose of Clonazepam, a medication prescribed for panic attacks.

21. On April 30, 2016, Plaintiff's beneficiary was transferred to the Adolescent Unit of Shepard Pratt Psychiatric Hospital and received treatment there through May 3, 2016.

22. Following discharge from Shepard Pratt, Plaintiff's beneficiary enrolled in a partial hospitalization treatment program at Northstar Academy ("Northstar"), in Rockville, Maryland. Northstar partial hospitalization was held from 9 am to 5 pm, Monday through

Friday, and attended weekly family therapy sessions. While at Northstar, an increase in Plaintiff's beneficiary's Zoloft dosage only lead to more drastic side effects with no additional relief from his depression.

23. On May 17, 2016, while enrolled at Northstar Academy, Plaintiff's beneficiary overdosed on illegally obtained prescription medication and received emergency treatment at Children's Hospital ("Children's") in Washington, DC. While at Northstar, Plaintiff's beneficiary tested positive for marijuana in two separate drug screenings and reported using drugs that could not be detected in standard drug testing.

24. Plaintiff's beneficiary's pattern of drug and alcohol abuse at Northstar continued. On June 18, 2016, Plaintiff's beneficiary was admitted to Children's Adolescent Psychiatric Unit for extreme unstable behavior and an apparent drug overdose. Plaintiff's beneficiary was released on June 24, 2016.

25. On July 5, 2016, Plaintiff's beneficiary was discharged from Northstar for noncompliance with staff, failure to change behavior, resistance to boundaries set by staff and parents, and the repeated rules violations. Northstar's Clinical Director, Leah Mandley, LCSW-C, recommended that Plaintiff's beneficiary be placed in a "residential treatment program secondary to the continued behaviors described above."

26. On July 7, 2016, Plaintiff's beneficiary interviewed for admission into the Dialectical Behavioral Therapy Program at Potomac Pathways in Cabin John, Maryland. However, Plaintiff's beneficiary was denied admission because the staff at Potomac Pathways determined, thorough the intake interview and discussion with administrative staff at Northstar, that they could not support Plaintiff's beneficiary's behavioral and mental health needs at an intensive outpatient level of care.

27. Plaintiff's beneficiary again met with Dr. Mitchell at the Bethesda Group in August 2016. Dr. Mitchell recommended an "out of home placement" due to Plaintiff's beneficiary's spiking emotional instability, increased drug use, noncompliance in the home and antisocial behavior outside the home.

28. On September 8, 2016, Plaintiff's beneficiary ran away from home, and did not return until September 14, 2016.

29. In September, 2016, Plaintiff's beneficiary was enrolled in the Open Sky Wilderness Therapy program ("Open Sky"), in Colorado. While at Open Sky it was revealed that Plaintiff's beneficiary misused alcohol, marijuana, and prescription medication multiple times in the summer of 2016.

30. While at Open Sky, Plaintiff's beneficiary received treatment from Jonathan Mitchell, MA, LPC, and Mark Braunstein, DO, ABPN. In a letter dated July 30, 2017, they wrote:

> "While [Plaintiff's beneficiary] made significant progress on treatment issues at Open Sky, it is my clinical assessment that his treatment issues were severe (e.g., significant emotional disturbance, lack of coping skills under stress), and necessitated continued residential treatment following Open Sky. Without this treatment, it is my professional opinion that [Plaintiff's son] would have been at extremely high risk for relapsing into past behaviors that would threaten his and others' physical and emotional safety and wellbeing.
> ...
> "It is my clinical opinion that [Plaintiff's beneficiary] required immediate placement in a therapeutic residential setting (residential treatment center) following his discharge from Open Sky. While I was encouraged by his progress, I believed [Plaintiff's son] had further emotional, relational, and behavioral issues that needed significant structure and attention. Without the appropriate residential and therapeutic supports [Plaintiff's son] would regress into a place of emotional dysregulation and continue to express anger, anxiety, self-harm, and other negative behavioral expression as a way to cope."

31. Plaintiff's beneficiary graduated from Open Sky on December 15, 2016. The therapist and psychiatrist who treated Plaintiff's beneficiary at Open Sky both recommended that Plaintiff's beneficiary continue receiving care at a residential treatment center in order to

allow for continued development and utilization of the coping mechanisms Plaintiff's beneficiary had begun to learn at Open Sky.

32. On December 16, 2016, Plaintiff's beneficiary was transported to Catalyst Residential Treatment Center ("Catalyst"), in Brigham City, UT. Catalyst is licensed in the state of Utah as a residential treatment center and complies with the state's guidelines to operate as such. At Catalyst, Plaintiff's beneficiary began intensive post-traumatic stress disorder (PTSD) therapy to help process the sexual assaults that had been experienced. The Catalyst psychiatrist also determined that Plaintiff's beneficiary suffers from a mood disorder and prescribed him Aripiprazole and Lamictal (lamotrigine).

33. While enrolled at Catalyst, Plaintiff's beneficiary was allowed home visits back to Washington, DC. During such a home visit in August, 2017, Plaintiff's beneficiary violated the policies of the home visit by consuming alcohol and was instructed to return to the Catalyst treatment facility immediately.

34. On August 18, 2017, rather than boarding his flight back to Utah, Plaintiff's beneficiary fled the airport and was missing until August 21, 2017. Plaintiff's beneficiary returned to Catalyst on August 22, 2017.

35. Plaintiff's beneficiary continued to receive treatment at Catalyst, engaging on an individual basis with a therapist once or twice per week and participating in group therapy multiple times a week for a total of nine (9) hours. Plaintiff's beneficiary received full-time care and psychiatric supervision. On November 21, 2017, Lisa Ann Dickman, LCSW, one of the treatment team members at Catalyst, stated in a letter:

> "Clinically, [Plaintiff's beneficiary] is diagnosed with (296.32) Major Depressive Disorder, recurrent, moderate with moderate anxious distress; (309.81) Post Traumatic Stress Disorder; (304.30) Cannabis use disorder, severe; (304.60) Other hallucinogen use disorder, severe; (304.00) Opioid use disorder, severe; (303.90) Alcohol use disorder,

moderate; (314.00) Attention deficit hyperactivity disorder, predominantly inattentive presentation

"[Plaintiff's beneficiary] has pervasive difficulties that initially seemed impossible to redirect, namely opposition to authority, resistance to structure, defiance towards parents and tendency to self-harm when rules are set and consequences are given. At present, [Plaintiff's son] is making slow but positive progress in these treatment areas.
...
"To help [Plaintiff's beneficiary] work to minimize his negative coping patterns and reduce symptoms of his depression, anxiety and oppositional defiance, we have engaged him in daily individual, weekly family and daily group therapies, for a minimum of 9 hours of therapy per week. ...We have also started [Plaintiff's son] on a mood stabilizer, which has helped a great deal in stabilizing his moods and supporting his cognitive and behavioral therapies. He is currently on Lamotrigine 200mg 1xam; Ariprazole 5mg 1xpm ... Significant improvements while taking these medications have been noted.

"At this time, it is recommended that [Plaintiff's beneficiary] continue at an RTC level of treatment. If he were to go home at this time it is extremely likely he would quickly return to his severe drug use, manipulations, and it wouldn't be long before he began to disengage from relationships and make high risk and possibly life-threatening decisions."

36. On June 8, 2018, Plaintiff's beneficiary was discharged from Catalyst because Plaintiff was no longer able to afford the out-of-pocket costs of treatment at Catalyst.

### Plaintiff's Benefit Claim for Residential Treatment at Catalyst

37. All prior paragraphs are incorporated by reference, as if fully set forth herein.

38. Plaintiff began submitting timely claims for coverage under the Plan for the mental health treatment his son received at Catalyst in January 2017.

39. On or around July 17, 2017, Cigna denied coverage for the mental health treatment Plaintiff's beneficiary received at Catalyst, claiming that the treatment "appears to be primarily for the purpose of providing a safe and structured environment," and that "less restrictive levels of care were available for safe and effective treatment." Cigna also claimed that Catalyst was not a Child/Adolescent Residential Mental Health Treatment facility as defined under the

Plan, but instead was a "Therapeutic Schools and Program" allegedly excluded from coverage.

40. On January 4, 2018, Plaintiff appealed Cigna's denial of coverage of the mental health treatment his son received at Catalyst and submitted additional reasoning and evidence supporting the appropriateness, medical necessity, and emergency need for that treatment under the Plan.

41. Cigna nonetheless upheld its benefit determination on February 2, 2018. Cigna explained its decision as follows:

> Based upon the available clinical information received initially and with this appeal, [your beneficiary's] symptoms did not meet Cigna Behavioral Medical Necessity Criteria for admission and continued stay at the Residential Mental Health Treatment for Children and Adolescents level of care from 01/01/2017-07/03/2018 as [your beneficiary] did not have a documented primary diagnosis of a moderate to severe mental health disorder, per the most recent version of the Diagnostic and Statistical Manual of Mental Disorders, along with evidence of significant distress and/or impairment. This admission appears to be primarily for the purpose of providing a safe and structured environment. Less restrictive levels of care were available for safe and effective treatment.

42. On June 10, 2018, Plaintiff appealed Cigna's denial of coverage to an Independent Review Organization (IRO) through Cigna's External Review Program. He submitted additional evidence supporting the appropriateness, medical necessity, and emergency need for that treatment under the Plan on June 27, 2018.

43. On July 27, 2018, the IRO upheld Cigna's denial of Plaintiff's benefits claim, parroting much of what Cigna stated in justifying their denial. The IRO discounted the severity Plaintiff's beneficiary's conditions, while also failing to address the evidence supporting his placement in a residential treatment facility.

44. Accordingly, all required pre-litigation appeals seeking the payment of health benefits for the mental health treatment Plaintiff's beneficiary received while admitted at Catalyst from

January 1, 2017, to June 8, 2018, have now been exhausted pursuant to 29 U.S.C. § 1133. Therefore, this matter is ripe for judicial review.

45. Moreover, contrary to the reasons asserted by Cigna, the services at issue, i.e., the mental health treatment Plaintiff's beneficiary received while admitted at Catalyst from January 1, 2017, to June 8, 2018, should have been covered under the terms of the Plan.

46. As a result, Plaintiff has improperly incurred unreimbursed expenses for that treatment in the total approximate amount of $168,308.70 that should have been covered and/or reimbursed under the Plan. As a direct and proximate result thereof, Plaintiff states a claim for benefits due under the terms of an employee welfare benefit plan for that treatment, and is entitled to recover all the expenses incurred thereunder that were not reimbursed, as well as the costs of this suit and his attorneys' fees.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

1. That the Court enter judgment in Plaintiff's favor and against Defendant, and order Defendant to reimburse Plaintiff in an amount equal to the contractual amount of health benefits to which he is entitled, i.e., for the approximately $168,308.70 in total charges incurred for his son's treatment at Catalyst that should have been covered under the Plan;

2. That the Court order Defendant to pay Plaintiff prejudgment interest on all past due health benefits that have accrued prior to the date of judgment;

3. That the Court award Plaintiff attorneys' fees pursuant to 29 U.S.C. § 1132(g); and

4. That the Court award Plaintiff any and all other penalties, damages, and equitable relief to which he may be entitled, as well as his costs of suit.

DATED: February 15, 2019

          /s/Denise M. Clark
Denise M. Clark (420480)
Clark Law Group, PLLC
1100 Connecticut Ave., N.W, Suite 920
Washington, D.C. 20036
Telephone: (202) 293-0015
Fax: (202) 293-0115
dmclark@benefitcounsel.com